## IN THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| **CHINETHA GLENN**, Individually, on Behalf of the Estate of **TAKARA GLENN HIGHTOWER**, and as Next Friend of Minor Children, **G.H.(1)**, **G.H.(2)**, **G.H.(3)**, **G.H.(4)**, and **G.H.(5)**; **DANIELLE RUFFIN**, and **SCOTT EDWARD SCOTT**, Plaintiffs | **NO. 4:24-cv-05140** |
| vs. | |
| **UNITED STATES OF AMERICA**, Defendant | |

## ORIGINAL COMPLAINT

Plaintiff Chinetha Glenn, individually and on behalf of the estate of Takara Glenn Hightower, and as next friend of five minor children, G.H.(1), G.H.(2), G.H.(3), G.H.(4), and G.H.(5), Danielle Ruffin, and Scott Edward Scott bring this complaint under the Federal Tort Claims Act, 28 U.S.C. § 2674. Plaintiffs complain of the United States and would show the following:

## PARTIES

1.1.     This case concerns the shooting and death of Takara Glenn Hightower by her husband, NCCS Gregory Lynn Hightower Jr., on September 22, 2022.

1.2.     Plaintiff Chinetha Glenn resides in Houston, Texas, within the jurisdiction of this Court. Plaintiff Chinetha Glenn is the biological mother of Takara Glenn Hightower, deceased. Chinetha Glenn is also the biological grandmother and legal guardian of Plaintiffs G.H.(1), G.H.(2), G.H.(3), G.H.(4), and G.H.(5).[1]

1.3.     Plaintiff G.H.(1) resides in Houston, Texas, within the jurisdiction of this Court. G.H.(1) is a minor child, DOB XX/XX/2010, and the biological daughter of Takara Glenn Hightower, deceased.

1.4.     Plaintiff G.H.(2) resides in Houston, Texas, within the jurisdiction of this Court. G.H.(2) is a minor child, DOB XX/XX/2013, and the biological son of Takara Glenn Hightower, deceased.

1.5.     Plaintiff G.H.(3) resides in Houston, Texas, within the jurisdiction of this Court. G.H.(3) is a minor child, DOB XX/XX/2015, and the biological daughter of Takara Glenn Hightower, deceased.

1.6.     Plaintiff G.H.(4) resides in Houston, Texas, within the jurisdiction of this Court. G.H.(4) is a minor child, DOB XX/XX/2019, and the biological daughter of Takara Glenn Hightower, deceased.

---

[1]    Under Fed. R. Civ. P.  5.1, minors' names and birthdays have been redacted. Where minors share the same initials, each minor is enumerated to avoid confusion.

1.7.    Plaintiff G.H.(5) resides in Houston, Texas, within the jurisdiction of this Court. G.H.(5) is a minor child, DOB XX/XX/2021, and the biological son of Takara Glenn Hightower, deceased.

1.8.    Plaintiff Chinetha Glenn is the biological mother of Takara Glenn Hightower. She is also the personal representative of the Estate of Takara Glenn Hightower, deceased, and the legally appointed guardian of Takara's five minor children, G.H.(1), G.H.(2), G.H.(3), G.H.(4), and G.H.(5).

1.9.    Plaintiff Danielle Ruffin resides in Peoria, Illinois. Danielle Ruffin is the biological daughter of Takara Glenn Hightower, deceased.

1.10.    Scott Edward Scott resides in Davenport, Iowa. Scott Edward Scott is the biological father of Takara Glenn Hightower, deceased.

1.11.    Defendant is the United States of America, its officers, agents, employees, and representatives.

1.12.    NCCS Gregory Lynn Hightower, Jr. was, at all times relevant to this lawsuit, an active-duty soldier employed by the United States of America. At all times relevant to this lawsuit, NCCS Hightower was obligated to follow all orders of his superiors at the Navy and failure to do so would have subjected him to disciplinary action, including court martial or imprisonment.

## JURISDICTION, SERVICE & VENUE

2.1.    This Federal District Court has jurisdiction because this action is brought under 28 U.S.C. § 2671–80, commonly known as the Federal Tort Claims Act.

2.2.     The United States of America may be served with process in accordance with Rule 4(i) of the Federal Rules of Civil Procedure by serving a copy of the Summons and Complaint on the acting United States Attorney Alamdar Hamdani, United States Attorney for the Southern District of Texas by certified mail, return receipt requested at his office:

> The United States Attorney's Office
> ATTN: Civil Process Clerk
> 1000 Louisiana Street, Suite 2300
> Houston, Texas 77002

2.3.     Service is also affected by serving a copy of the Summons and Complaint on Merrick B. Garland, Attorney General of the United States, by certified mail, return receipt requested at:

> The Attorney General's Office
> ATTN: Civil Process Clerk
> 950 Pennsylvania Avenue, NW
> Washington, DC 20530-0001

2.4.     Venue is proper in this judicial district under 28 U.S.C. § 1402(b) because the United States of America is a defendant, and the acts and omissions complained of in this lawsuit occurred in this judicial district. Further, one or more plaintiffs reside in this judicial district.

## AGENCY

3.1.     This case is commenced and prosecuted against the United States of America to and in compliance with Title 28 U.S.C. §§ 2671–80, the Federal Tort Claims Act. Liability of the United States is predicated specifically on 28 U.S.C. § 2674 because the personal injuries and resulting

damages of which the complaint is made were proximately caused by the negligence, wrongful acts and/or omissions of employees and/or agents of the United States of America working for the Department of the Navy, while acting within the scope of their office, employment, and/or agency under circumstances where the United States of America, if a private person, would be liable to the Plaintiffs in the same manner and to the same extent as a private individual.

3.2.     The United States Department of the Navy is an agency of the United States of America.

3.3.     At all times material to this lawsuit, all agents, servants, or employees within the Department of the Navy were acting within the course and scope of their employment.

## JURISDICTIONAL PREREQUISITES

4.1.     Pursuant to 28 U.S.C. §§ 2672 and 2675(a), the claims set forth here were filed with and presented administratively to the Department of the Navy on August 7, 2023.

4.2.     The claim of Chinetha Glenn, individually, set forth a "sum certain" of $30,000,000.

4.3.     The claim of Chinetha Glenn, on behalf of the estate of Takara Glenn Hightower, deceased, set forth a "sum certain" of $30,000,000.

4.4.     The claim of Chinetha Glenn, as next friend of G.H.(1), a minor, set forth a "sum certain" of $30,000,000.

4.5.     The claim of Chinetha Glenn, as next friend of G.H.(2), a minor, set forth a "sum certain" of $30,000,000.

4.6.     The claim of Chinetha Glenn, as next friend of G.H.(3), a minor, set forth a "sum certain" of $30,000,000.

4.7.     The claim of Chinetha Glenn, as next friend of G.H.(4), a minor, set forth a "sum certain" of $30,000,000.

4.8.     The claim of Chinetha Glenn, as next friend of G.H.(5), a minor, set forth a "sum certain" of $30,000,000.

4.9.     The claim of Danielle Ruffin set forth a "sum certain" of $30,000,000.

4.10.     The claim of Scott Edward Scott set forth a "sum certain" of $30,000,000.

4.11.     No exception to the Federal Tort Claims Act, 28 U.S.C. § 2680, bars this lawsuit.

4.12.     On July 2, 2024, the Department of the Navy denied Plaintiffs claims. This lawsuit is filed within six months of the Government's denial.

4.13.     Accordingly, Plaintiffs have complied with all jurisdictional prerequisites and conditions precedent to the commencement and prosecution of this suit.

## FACTS

5.1.     This claim concerns the shooting and death of Takara Glenn Hightower by her husband, NCCS Gregory Lynn Hightower, Jr. on September 22, 2022. At approximately 4:07 pm, Takara Glenn Hightower

was being interviewed by two Naval Criminal Investigative Service agents in connection with a domestic violence complaint that she filed against her husband. After being tipped off by the Government that his wife was talking to Navy criminal investigators, Gregory Hightower sped home and shot his wife several times in the face as she held baby G.H.(5) in her arms. Takara was killed, leaving her six children without a mother and her parents without their daughter.

5.2.    Long before Gregory Hightower's pattern of domestic violence was known to the Navy, the United States government knew that domestic violence can be deadly for women.

5.3.    In 1996, the Domestic Violence Offender Gun Ban, also referred to as the "Lautenberg Amendment," made it illegal to sell firearms to anyone convicted of a misdemeanor crime of domestic violence. In abusive relationships, the severity of domestic violence often increases over time, and the presence of a firearm increases the likelihood of homicide.[2] Congress recognized that "[f]irearms and domestic strife are a potentially deadly combination."[3] As one Senator noted during the debate over § 922(g)(9), "[A]ll too often, the only difference between a battered woman and a dead woman is the presence of a gun." 142 Cong. Rec. 22986 (1996) (statement of Sen. Wellstone). The same amendment also made it illegal for anyone who had been committed to a mental institution to buy or possess firearms.

---

[2]    *See* Campbell et al., Assessing Risk Factors for Intimate Partner Homicide, DOJ, Nat. Institute of Justice J., No. 250, p. 16 (Nov. 2003) ("When a gun was in the house, an abused woman was 6 times more likely than other abused women to be killed").

[3]    *See Voisine v. United States*, 136 S. Ct. 2272 (2016) (*citing United States v. Hayes,* 555 U.S. 415, 427 (2009)).

5.4.    Domestic violence has been a particular problem in the United States military and the focus of Congressional attention for over 20 years. From 2000 to 2003, the Department of Defense organized a congressionally directed Defense Task Force on Domestic Violence, which issued three reports with 200 recommendations for improvement.[4] The Department of Defense recorded over 40,000 domestic abuse incidents involving military servicemembers, spouses, or intimate partners from 2015 to 2019.[5]

5.5.    The military has a special relationship with active duty service members and has created a system to address domestic violence that transcends the limitations faced by civilian law enforcement in handling domestic violence. Domestic violence while enlisted in the military carries criminal consequences for the offender, and it is often career-ending as well. This raises the stakes for both reporting victims and offenders.

5.6.    But beyond negative consequences, military commanders have an array of tools to address domestic violence, including mandatory treatment plans, removing an offender's access to weapons, requiring compliance with counseling and other interventions designed to create a safer environment for families.

5.7.    To address domestic violence within its ranks, the military created the Family Advocacy Program ("FAP"), established through Department of Defense Regulation 6400, to support active-duty service members, their spouses, partners and families. Its mission is "to prevent adult-initiated abuse, ensure victim safety and provide treatment for those

---

[4]    *See* GAO-21-289, p.8, May 06, 2021.

[5]    *See id.*

impacted by abuse through advocacy, counseling and educational services that promote healthy relationships and parenting." Under this system, Commanders and FAP Victim Advocates each have responsibilities to domestic violence victims.

5.8.    DOD regulations specify that Commanders shall "[e]nsure that safe housing has been secured for the victim as needed."[6] This requirement is echoed in the Navy Family Advocacy Program regulations too.[7] Additionally, Commanders shall "[e]nsure that the alleged military abusers are held accountable for their conduct through appropriate disposition under the UCMJ (Chapter 47 of Reference (p))and/or administrative regulations as appropriate."[8] Commanders shall "[i]n consultation with FAP staff, ensure a safety plan is prepared and in place and monitor the victim's safety."[9] Commanders shall "[c]onsult FAP staff to determine if an alleged abuser is a suitable candidate for clinical intervention services and his/her level of danger to the victim and others."[10]

5.9.    Commanders shall "[e]nsure protection of all persons alleged or known to be at risk from domestic abuse by issuing and enforcing an appropriate military protection order (MPO) that is coordinated with those civilian authorities that enforce the protection orders issued by civilian

---

[6]    DoD Instruction 6400.06, 6.1.1.9, August 21, 2007, Incorporating Change 4, May 26, 2017.

[7]    OPNAVINST 1752.2C, Ch. 3, 2.g (20 May 2020); *see also* OPNAVINST 1752.2C, Ch. 7, 2.b. ("Ensure safe housing has been secured for the victim as needed").

[8]    DoD Instruction 6400.06 at 6.1.1.1.; OPNAVINST 1752.2C at  Ch. 3, 2.a.

[9]    *Id.* at 6.1.1.14.

[10]    *Id.* at 6.1.1.18.

courts."[11] Commanders may issue MPOs with terms that are more restrictive than civilian protective orders (CPOs).[12] Commanders "[s]hall issue and monitor compliance with an MPO when necessary to safeguard a victim, and maintain good order and discipline while a victim has time to pursue a protection order through a civilian court, or to support an existing CPO."[13] Commanders "[s]hall tailor the terms of the MPO to meet the specific needs of an individual victim."[14]

5.10.    Commanding officers have the authority to remove firearms, including personal firearms, from service members suspected of domestic violence through an MPO. On DD Form 2873, the Military Protective Order, a commanding officer can order the surrender of government weapons and/or personal firearms.[15] This information is then reported to the National Crime Information Center (NCIC). Unlike CPOs, MPOs do not have an expiration date until it is rescinded by the commanding officer. Violation of the MPO or a CPO constitutes a criminal violation of the Uniform Code of Military Justice.

5.11.    FAP Victim Advocates also have duties to victims of domestic violence in the military. FAP Victim Advocates shall "[a]ssess the situation for imminent danger of life-threatening physical harm to the victim or another person."[16] If imminent danger of life-threatening physical harm

---

[11]    *Id.* at 6.1.1.22.

[12]    DoD 6400.06 at 6.1.2.5.3.

[13]    *Id.* at 6.1.2.1.

[14]    *Id.* at 6.1.2.4.

[15]    DD 2873, p. 3.

[16]    DoD Instruction 6400.06 at 6.4.2.6.

exists, even if the victim has elected the restricted reporting option, command or law enforcement will still be notified if, based on the assessment, there is a good faith belief that there is a serious and imminent threat to the health or safety of the victim or another person. The Navy requires all FAPs to "[a]ssess for imminent danger of life-threatening physical harm to the victim or another person and create a safety plan, as needed. FAP VAs must immediately report any increase in victimization patterns to the FAR [family advocacy representative], security or the command."[17]

    5.12.   The "High Risk for Violence-Coordinated Community Response" (HRVCCR) team must be activated when, in the judgment of the FAR, there is a threat of immediate and serious harm to Service members, family members, or unmarried intimate partners."[18] The HRVCCR team provides "rapid assistance, case coordination including ongoing safety planning, risk assessments and case management. The team must monitor safety and risk reduction actions put in place as a result of a high risk situation. Meetings must be scheduled as needed to ensure risks are reduced and client care has been appropriately coordinated and resolved."[19] FAP clinicians "must use the DoD approved FAP incident severity scale to accurately, consistently, and reliably determine the level of severity associated with all met criteria cases of domestic or child abuse."[20] FAP risk monitoring begins "when the report of suspected domestic or child abuse is received and continues throughout the

---

[17]  OPNAVINST 1752.2C at Ch. 9, 3.c.

[18]  *Id.* at Ch. 14 1.a.

[19]  *Id.* at Ch. 14 1.b.

[20]  *Id.* at Ch. 14, 3.c.

life of the FAP case."[21] The "Intimate Partner Physical Injury Risk Assessment Tool" must be used by clinical providers to make predictions about the likelihood of future violence by domestic abuse offenders."[22]

5.13.    In May 2021, the United States Government Accountability Office (GAO) issued a report to Congressional Committees entitled "Domestic Abuse: Actions Needed to Enhance DOD's Prevention Response, and Oversight" and made 32 recommendations to the military to improve the military's response to domestic violence within its ranks.[23] The GAO found that DOD and military services had taken steps to implement domestic abuse prevention by establishing FAP offices, but that gaps remained in key areas, including monitoring and overseeing IDC proceedings and command actions related to domestic violence incidents.[24] Additionally, the GAO found that the Navy Family Advocacy Program training materials for commanders only addressed six of the 13 DOD-required topics, and commanders were not always aware of key responsibilities for domestic abuse prevention and response.[25]

5.14.    One of the GAO recommendations to the Navy was that the Secretary of the Navy should issue guidance, updating its service FAP policy, to specify the risk assessment tools required to be used and the type of personnel responsible for implementing each tool.[26] The Navy concurred with

---

[21]  *Id.* at Ch. 14, 4.b.

[22]  *Id.* at Ch. 14, 4.d.

[23]  *See* GAO-21-289, May 06, 2021.

[24]  *Id.*

[25]  *Id.*

[26]  *Id.*, Recommendation 18.

this recommendation and in July 2022, issued an administrative message identifying the risk assessment tools to be used by victim advocates. The GAO also recommended that the Secretary of the Navy provide additional guidance or sample training materials for installation-level commander and senior enlisted advisor domestic abuse training that meets all DOD requirements.[27] The Navy agreed with this recommendation and issued new FAP training in January 2021.

5.15.    The Hightower family first became involved with the Navy's FAP in 2022. But NCCS Gregory Hightower's problems began earlier, in 2019, when he was under the care of an outpatient psychiatrist for depression. In August 2020, NCCS Hightower was treated as an inpatient for 20 days for recurrent, severe major depressive disorder at Laurel Ridge Treatment Center. In 2021, NTAG Houston Commander Decker received word that NCCS Hightower was struggling and needed help. Commander Decker and CMC Alex Ricones sent NCCS Hightower to in-patient mental health treatment for 30 days. Any command directed in-patient mental health treatment is considered a Command Order, the violation of which subjects the service member to court-martial.

5.16.    After his mental hospital stays, his wife, Takara ("Kai") Glenn Hightower reported her husband for domestic abuse on multiple occasions. On July 16, 2022, the Harris County Sheriff's Office responded to the home over reports of a verbal and physical altercation. The district attorney ordered one of them to leave the home for 24 hours as a result of the incident.

---

[27]    *Id.*, Recommendation 28.

5.17.    On September 14, 2022, Takara called FAP and Command Family Ombudsman Rosa Castillo asking for help because she had a recent argument with NCCS Hightower that scared her and her children, and they no longer felt safe with him around. Takara requested help from NTAG Houston Command Leadership to remove Greg from the home so she could safely separate from him.

5.18.    Takara told Command FAP Castillo that she had tried getting help from local law enforcement but they would not remove him because he had not hit her. She informed the Command FAP that there had been physical and verbal abuse in the past and marital issues were escalating. She said they were having heated arguments in front of the children and she was scared that he would snap and lose control.

5.19.    Takara also told Command FAP Castillo that in the last two years, her husband's mental health had "declined drastically." Takara told her that Former NTAG Houston Commander Decker was notified that NCCS Hightower was struggling with mental health issues and that Commander Decker along with CMC Alex Ricones sent NCCS Hightower to rehab because he was struggling and needed help.

5.20.    Takara also notified Command FAP Castillo that her husband's mental health was worsening, and that local law enforcement would not help. She said that she needed the help of Navy Command to intervene to avoid a domestic violence incident that would hurt NCCS Hightower's career.

5.21.    During this conversation, Takara told Command FAP Castillo that they had 6 children. She relayed how husband loved his job and at one point was "amazing at it," but Takara was worried that his career would be

destroyed by further domestic violence. She and the kids depended on his income, so she asked Command Leadership to intervene and help him recover. At this time, Takara hoped that she and NCCS Hightower would not lose everything they had worked hard to build for years.

5.22.    Takara informed Command FAP Castillo that her husband was out of town, but warned Command FAP Castillo that her husband would return the following day. Naval Command needed to act quickly because – as Takara informed Command FAP Castillo – her husband's mental health issues made Takara fear how he would take the news that she decided to separate, and she felt it was best for Command Leadership to be involved to advise him and prevent something terrible from happening upon NCCS Hightower's return. Takara said she wanted to leave him safely and without issues (domestic violence or loss of job/income security).

5.23.    Even before this domestic violence investigation, Command FAP Castillo knew the Hightower family personally. Her husband, Retired Chief Gilberto Castillo and NCCS Hightower were both stationed at NRD Miami together, and in 2016, her husband and Hightower made chief together. According to Command FAP Castillo, "everyone knew Greg [Hightower] had been struggling for a while and needed serious intervention."

5.24.    Takara expressed her particular fear that her husband was close to his breaking point because he had purchased guns. NCCS Hightower did not require a weapon for his job as a Naval recruiter and was not issued a weapon pursuant to his role in the Navy but he had recently acquired personal weapons. Command FAP Castillo asked Takara where the gun(s) were and Takara explained that she hid one handgun in the home to keep it away from Greg, but she reported she did not know where he kept the others.

She did not know how many he had in his possession, or where NCCS Hightower may have been storing them. Takara said she feared that Greg was "close to his breaking point" because he had purchased guns.

5.25.    Command FAP Castillo thanked Takara for calling her and told her she understood exactly what she needed help with, and that she did the right thing by involving the FAP. Command FAP Castillo told Takara that she would explain everything that Takara told her to Commander Andrew Tyler to get both Greg and Takara the help that they needed to avoid a domestic violence incident upon his return.

5.26.    Command FAP Castillo told Takara she was going to call Commander Andrew James Tyler, CMC, NTAG Houston and explain her situation and resolution requests. She told Takara to stand by for his call, because he would call her afterwards to provide the requested assistance.

5.27.    Command FAP Castillo called Commander Andrew Tyler immediately after ending her call with Takara to request immediate and urgent assistance for this family. He didn't answer, so she left a voicemail and sent him a text message asking him to call her back.

5.28.    On September 14, 2022, NTAG Houston Commander Andrew Tyler returned Command FAP Castillo's call at 12:32 PM. At that time, Commander Tyler was informed of ongoing domestic violence occurring at the Hightower residence. Command FAP Castillo relayed everything that Takara told her, and explained that the matter was urgent, and required extreme tact and proper response from Command Leadership.

5.29.    She made a point to advise Tyler that Command Leadership "must intervene and avoid domestic violence and misfortune from happening

upon Greg's return." Commander Tyler said that NCCS Hightower was already on Command Leadership's radar due to poor work performance.

5.30.    Command FAP Castillo highly emphasized the importance of removing gun(s) from the home, and or in Greg's possession due to his mental health history. She made Tyler aware that Command Leadership Commander Decker and CMC Alex Rincones had previously intervened in 2021 when they sent him for a "30 day rehab" for mental healthcare. Command FAP Castillo told him that Takara feared her husband was not going to receive the marriage separation news well due to his mental health issues, worsening of symptoms, escalating arguments between them, and that he looked angrier and more stressed lately. She advised Tyler that Takara knew where a handgun was hidden in the home, but that she did not know where he kept other guns.

5.31.    Command FAP Castillo advised Tyler that if he could not take possession of the handgun(s) for any reason to please let her know so that she could know to confiscate the handgun Takara had in her possession at that time in order to immediately remove known weapons from the home. Ensuring that weapons were inaccessible to NCCS Hightower was Command FAP Castillo's main concern and she repeated that to Commander Tyler. She also asked Commander Tyler to ask Greg if he had other gun(s) in his possession, and if so, to convince him to surrender the weapons. She urged Commander Tyler to investigate the matter carefully and keep in mind that Greg also needed help and that Takara wanted this help for her and her husband because their family's future "depended on it."

5.32.    Commander Tyler responded that he was unaware of the past mental health struggle/interventions, but that he appreciated the

information and would make some calls because he was "unsure about removal of gun/weapon procedures."

5.33.    Commander Tyler promised to inform Command FAP Castillo if they had an issue with the weapon removal, so that Command FAP Castillo could immediately confiscate the weapon. She quickly reminded Tyler that she "would if they couldn't." Command FAP Castillo agreed to remain a point of contact for Takara. Naval Command voluntarily undertook the obligation to remove weapons from the home and assured Takara they would follow through on that obligation. But they never did.

5.34.    On September 14, 2022, NTAG Houston command issued a "no contact order" to NCCS Hightower which prohibited contact between he and Mrs. Hightower. He left the family home.

5.35.    Less than a week later, on September 20, Takara called Command FAP Castillo and reported that the handgun that Takara had hidden from her husband was missing. Takara had been asked to leave the house for a few hours that day to allow Greg to pick up some belongings. Instead of removing the firearms, the Navy gave NCCS Hightower unsupervised access to his weapon. Takara informed Naval Command of her belief that NCCS Hightower went to the home and found the hidden firearm.

5.36.    The gun that Takara reported as missing was the same gun that Command FAP Castillo previously told Commander Tyler to remove from the house but he never did. Takara also reported that earlier that same day, her husband had somehow cut the house electricity off. Command FAP Castillo told Takara to call Tyler. Takara said that she did, but that he wasn't available.

5.37.    Also on September 20, Takara called the Harris County Sheriff's office to inquire about how she could file for a restraining order. At 8:37 PM that same day, Command FAP Castillo texted Commander Tyler "AJ, please give me a call. It's an emergency." She did not receive a call from him until the following day, September 21.

5.38.    Once he finally returned her call, Command FAP Castillo told Commander Tyler "Greg has the gun. Greg found the gun when he was allowed to pick up belongings from the home." She reminded him to please intervene carefully to help this family. Command FAP Castillo also told Commander Tyler that Greg had cut the house electricity the day before. She also informed him that they had evidence of strangulation and threats made at gunpoint during previous altercations between NCCS Hightower and Takara and that this case had been referred to NCIS for criminal investigation.

5.39.    In response, Commander Tyler thanked Command FAP Castillo for letting him know and said he was going to handle it.

5.40.    On September 21, 2022, NCCS Hightower willingly signed a Military Protective Order (MPO) Form DD 2873.

5.41.    At 7:02 PM on September 21, 2022, Command FAP Castillo drove to Takara's house to help her open her electricity box to try to restore power that her husband had cut off. She was able to help her open the box and resolve the electrical issues.

5.42.    Takara told Command FAP Castillo that an hour or two prior, a sailor had handed her a military restraining order for this case. Takara thanked Command FAP Castillo but turned pale, looked straight at her and

said, "I still feel Greg can come home and kill me." Takara said this in front of her children. Command FAP Castillo assured her that Command Leadership was now helping and said she, Greg, and the kids would be okay. Command FAP Castillo told Takara that the restraining order was a "win," that Greg couldn't come to the home now, and "Command Leadership is now helping."

5.43.    But when Takara received the MPO, she noticed that the MPO did not include the correct address and was missing two of their children. These errors in the MPO further reflect Commander Tyler's lack of attention to detail in taking this matter seriously.

5.44.    Because the Navy failed to properly complete the family's information on the first MPO, an amended MPO was necessary with the correct address and including all of their children. The MPO was redrafted and signed by CDR Henderson on September 22, but it was necessary to have NCCS Hightower sign the amended MPO as well.

5.45.    On September 22, 2022, NCIS and the Family Advocacy Program called the Naval office where NCCS Hightower worked and asked if he was in the office and could remain there. Navy personnel then attempted to issue the corrected MPO to NCCS Hightower at NTAG Houston Headquarters around noon. But this time Greg Hightower refused to sign the corrected MPO and requested to have his children removed as protected persons. That request was denied.

5.46.    On September 22, Naval command knew that NCCS Hightower had a violent history of domestic violence with Takara; that he had been admitted as an in-patient to a mental hospital in 2020 and again for a month

in 2021 by his Commanders; that he had recently acquired firearms; that his violence towards Takara was escalating; that he had previously attempted to strangle Takara; that he had previously held Takara at gunpoint threatening to kill her; that less than 24 hours prior he cut the electricity to the family home; that he had accessed the family home on September 20 and found the hidden gun, which was likely in NCCS Hightower's possession; and that he was no longer cooperative with signing the MPO.

5.47.    Despite this knowledge, on September 22, Naval command made the shocking choice to put Takara Hightower in imminent and life-threatening danger by telling NCCS Gregory Hightower that NCIS officers were — *at that very moment* — at his home interviewing Takara about domestic violence. As soon as he was told this information, he abruptly announced that he had to leave for a "doctor's appointment" and left the building. Naval command did not attempt to detain him or otherwise request he remain under their temporary supervision while officers adequately investigated and secured Takara and the children. Instead, Naval command let NCCS Hightower leave the NTAG Houston Headquarters completely unsupervised.

5.48.    Of course, there was no doctor's appointment. Predictably, NCCS Hightower departed from Headquarters armed with the handgun that Naval command promised to confiscate and headed straight for his home address of 12510 Tullich Drive.

5.49.    NCIS agents and family advocacy personnel at the Hightower home soon phoned Naval headquarters to report that a car was driving back and forth past the home and that they were concerned it was NCCS Hightower. It was, in fact, NCCS Hightower. Yet the NCIS agents in the

home with Takara Hightower did nothing to secure her home or keep her safe.

5.50.    NCCS Hightower freely and easily entered the home, took out his handgun and shot Takara multiple times in the face and head while she held their infant child in her arms. While fleeing, he began exchanging gunfire with NCIS agents in front of the home, injuring one of the NCIS agents in the upper shoulder and the lower abdomen. The agents returned fire, striking NCCS Hightower in the lower stomach.

5.51.    NCCS Hightower then drove to his mother's apartment complex about 40 minutes away from the home. While on route to his mother's, Navy personnel called NCCS Hightower and ordered him to turn himself in to the police. Upon reaching him by phone, NCCS Hightower said words to the effect of "she can't get away with this," "it's all over," and "only God can judge me now." NCCS Hightower called his mother and told her to call 911 because he had three gunshot wounds. He told her "after you call 911 I need you to step away." Harris County Deputies responded to the 911 call at the apartment. He exchanged gunfire with Harris County Deputies upon their arrival.

5.52.    NCCS Hightower was shot and killed by Harris County law enforcement at 16:58 on September 22, 2022.

5.53.    Back at the Hightower's home, first responders found Takara dead, with her back against the wall in the living room. Portions of her brain and skull were visible, and her face was unrecognizable. Her newborn child, G.H.(5) was still alive in her arms. Their three-year-old child, G.H.(4), was also in the house when her mother was shot in the face by her father.

5.54.    Takara's murder was foreseeable and entirely avoidable. Naval command failed to do what it voluntarily undertook by failing to remove the firearm that NCCS Hightower used to murder Takara. Naval command failed to properly train its personnel to understand the procedures for removing firearms in domestic violence investigations. Naval command failed to supervise NCCS Hightower when he was retrieving belongings from the house despite knowing that he had guns in the home, which he retrieved for the murder. NCIS failed to timely respond to Command FAP Castillo's urgent requests and reports of an emergency. Finally, NCIS directly put Takara and her children in imminent danger by disclosing to NCCS Hightower that at that very moment, his wife was being interviewed by the Navy for a domestic violence complaint at his home. Had Naval command properly secured the home, removed his weapons and prevented NCCS Hightower from having open access to a domestic violence victim in the middle of a domestic violence interview, he would not have been able to murder his wife.

5.55.    The Navy was aware of the specific risk that Takara Hightower would be shot and killed by her husband. Had the Navy reasonably protected this mother of six from the predictable and foreseeable murder that she expressly warned them about only the day before, Takara Hightower would still be alive.

## CAUSES OF ACTION

1. *Negligence*

6.1.    The Navy's failures to train personnel on the removal of firearms, failure to remove firearms from the home, failure to correctly issue

the Military Protective Order, failure to keep the location of a domestic violence victim confidential, as well as the failure to secure an alleged domestic violence victim from her attacker, were operational in nature. The Government failed to perform operational tasks of collecting, handling, processing, and securing, as described in this Complaint.

6.2.    The Department of the Navy failed to use ordinary care and failed to do that which a person of ordinary prudence would have done under same or similar circumstances in the following ways:

(a) by failing to confiscate, collect, or otherwise remove the firearm(s) from the Hightower's home, as described in this Complaint;

(b) by failing to train Navy personnel on the proper procedure for removal of firearm(s) from a domestic violence victim's home, as described in this Complaint;

(c) by permitting NCCS Hightower to access the Hightower home unsupervised—or, alternatively, failing to restrict NCCS Hightower's access to the home without proper supervision—during which time he had access to the firearm(s) the Government knew were hidden from him but remained inside the home;

(d) by failing to accurately and properly complete and/or execute the first MPO, which NCCS Hightower willingly signed but was missing two of the Hightower children's names and included the incorrect home address, which necessitated a

second MPO that NCCS Hightower later refused to sign, as described in this Complaint;

(e) by disclosing to NCCS Hightower the contemporaneous time and location of a domestic violence complaint being brought against him, while the victim was being interviewed by NCIS personnel inside the Hightower home, with the knowledge of NCCS Hightower's escalating aggression, including that NCCS Hightower had cut off electricity to the home in the 24-hours prior, and had access to weapons, as described in this Complaint;

(f) by failing to properly supervise, detain, or otherwise restrict NCCS Hightower's ability to leave Naval Command, unsupervised, and access the location where his alleged victim was being interviewed as part of a domestic violence complaint, as described in this Complaint; and

(g) by failing to properly secure the Hightower home and protect Takara Hightower by restricting NCCS Hightower from accessing the home and victim, with the knowledge that NCCS Hightower was circling the neighborhood, had shown escalating signs of aggression in the 24-hours prior, and had access to weapons.

6.3.    Alternatively, the Department of the Navy failed to use ordinary care and failed to do that which a person of ordinary prudence would have done under same or similar circumstances by failing to ensure NCCS Hightower was not armed or otherwise could inflict serious bodily harm

before permitting him entry into the dwelling while a domestic violence interview was ongoing, as described in this Complaint.

6.4.    At all times relevant to this lawsuit, the officers, employees, agents, or representatives of the United States were negligent and caused the injuries and damages sustained by the Plaintiffs.

## 2.  *Negligent Undertaking*

6.5.    In Texas, a duty to use reasonable care arises when a person undertakes to provide services to another, either gratuitously or for compensation. Texas law imposes liability for physical harm resulting from failure to exercise reasonable care to perform its undertaking. In this case, Plaintiffs relied on the voluntary undertaking of the Navy for their safety. Moreover, the Navy's negligence in this undertaking increased the risk of the very type of harm that Plaintiffs' suffered.

6.6.    The Navy, through its agents, officers, and employees, voluntarily undertook the following responsibilities, as discussed in further detail below:

> (a) the responsibility to confiscate, collect, or otherwise remove the firearm(s) from the Hightower's home, as described in this Complaint;

> (b) the responsibility to restrict or otherwise supervise NCCS Hightower's access to the Hightower home to gather his belongings—during which time he had access to the firearm(s) the Government knew were hidden from him but remained inside the home;

(c) the responsibility to accurately and properly complete and/or execute the first MPO, which NCCS Hightower willingly signed but was missing two of the Hightower children's names and included the incorrect home address, which necessitated a second MPO that NCCS Hightower later refused to sign, as described in this Complaint;

(d) the responsibility to keep Takara reasonably safe from harm from her husband while the Navy, its agents, officers, and employees, interviewed her at her home as part of an ongoing domestic violence investigation, but instead disclosing the contemporaneous time and location of the domestic violence complaint to NCCS Hightower;

(e) the responsibility to keep Takara reasonably safe from harm from her husband while the Navy, its agents, officers, and employees, interviewed her at her home as part of an ongoing domestic violence investigation, but instead permitting NCCS Hightower to leave Naval command, unsupervised, where he, predictably, traveled to the location his wife was being interviewed by the Navy; and

(f) the responsibility to keep Takara reasonably safe from harm from her husband while the Navy, its agents, officers, and employees, interviewed her at her home as part of an ongoing domestic violence investigation, but instead allowing NCCS Hightower to enter the home, armed, mid-interview, with the knowledge that NCCS Hightower was circling the

neighborhood, had shown escalating signs of aggression in the 24-hours prior, and had access to firearms.

6.7.    The Navy voluntarily undertook the responsibility to remove the firearm that NCCS Hightower later used to murder his wife. On multiple instances, Command FAP Castillo and A. Tyler voluntarily undertook the duty to visit the Hightower residence, where Takara had informed the Navy she was hiding a firearm from her husband out of fear he would use it on her and her children. The Navy had express consent to confiscate the weapon to ensure NCCS Hightower, who had a known history of mental health issues and was reported to have recently beat, choked, strangled, and threatened the life of his family at gunpoint, would not have access to a firearm while he was investigated. The Navy, through its agents, officers, and employees, voluntarily undertook the duty to remove the firearm but failed to do so.

6.8.    The Navy, through its agents, officers, and employees, voluntarily undertook the duty to make sure that someone from the Navy actually respond by dispatching an officer or member of NCIS, Naval Command, or Family Advocacy to the Hightower residence to remove the firearm.

6.9.    Between September 14 and 20, the Navy, through its agents, officers, and employees, voluntarily undertook the duty to correct any incomplete or outstanding response to the Hightower residence to remove the firearm. On multiple occasions, the Navy was alerted of its negligent failure to perform the duties it voluntarily undertook. The Navy had time to take corrective action but failed to do so.

6.10.    Additionally, the Navy, through its agents, officers, and employees, voluntarily undertook the responsibility to restrict NCCS Hightower's access to the firearm(s) by supervising his access the Government granted to the Hightower home to purportedly gather his personal belongings, knowing the firearm(s) was hidden from him but remained in the home. In addition to failing to remove the firearm, the Navy took the additional step of allowing NCCS Hightower into the unsecured home unsupervised – knowing that the firearm was still in the residence. The Navy provided NCCS Hightower with the direct opportunity to obtain his firearm instead of keeping him from accessing it. As a result, NCCS Hightower was able to enter the family residence, under the guise of gathering personal belongings, and arm himself with the handgun his wife hid from him and the Navy undertook to remove from the home.

6.11.    Once Takara reported that her husband had found the hidden gun, the Navy voluntarily undertook the duty to confiscate the firearm from NCCS Hightower that it expressly knew about. Again, the Navy had time and opportunity to take corrective action but failed to do so.

6.12.    The Navy's failure to remove the firearm it voluntarily undertook the responsibility to remove, coupled with providing NCCS Hightower to unfettered access to the firearm increased the risk, foreseeability, and likelihood of injury to Takara. For one, the Navy had expressly understood the risk posed to Takara of leaving a gun accessible to NCCS Hightower. Failing to remove the firearm increased the risk that NCCS Hightower would be able to arm himself with a deadly weapon and increased the risk of harm to Takara. It was also foreseeable that failing to remove the gun, as it undertook the duty to do, put Takara and her children

in danger. The Government admitted as much in initiating operational processes that never materialized. Failing to remove the firearm increased the likelihood of injury to Takara. Compounding this failure, the government increased the likelihood of injury to Takara again by giving NCCS Hightower direct access to the home, without proper supervision, to obtain his belongings. The Navy had the opportunity to prevent NCCS Hightower from taking the gun at this moment, but instead gave him unfettered access to his weapon.

6.13.    The Navy, through its agents, officers, and employees, voluntarily undertook the duty to accurately and properly complete and/or execute the first MPO, which NCCS Hightower willingly signed but was missing two of the Hightower children's names and included the incorrect home address. Its failure to do so necessitated a second MPO that NCCS Hightower later refused to sign shortly before he murdered his wife. Failing to accurately and properly complete the first MPO increased the risk, foreseeability, and likelihood of injury to Takara. For one, the first MPO did not accurately restrict NCCS Hightower's access to their home address, meaning he was not in violation of any MPO by entering the home. Accurately securing the home of a domestic violence victim is paramount and the failure to do so increased the risk of harm to Takara. By failing to get it right the first time, where NCCS Hightower willingly signed the MPO, the necessity to prepare a corrected, second MPO, and present it to NCCS Hightower for another signature, after he had time to appreciate the impact his wife's complaint would have on his military career, foreseeably increased the risk of noncompliance and of injury to Takara.

6.14.    On September 22, 2022, the Navy voluntarily undertook the responsibility to keep Takara reasonably safe from harm from her husband while the Navy, its agents, officers, and employees, interviewed her at her home as part of an ongoing domestic violence investigation. Instead of reasonably performing that duty it voluntarily undertook, the Navy, through its agents, officers, and employees, negligently and needlessly informed NCCS Hightower that his wife was at that very moment being interviewed as part of a domestic violence investigation at his home, then negligently allowed him to leave Naval headquarters while the interview was ongoing, and negligently permitted him access to Takara, mid-interview, while armed.

6.15.    The failure to use reasonable care in disclosing the contemporaneous interview with his wife, the exact location of where that interview was taking place, and permitting NCCS Hightower to leave Naval command unescorted increased the risk, foreseeability, and likelihood of harm to Takara.

6.16.    The failure to use reasonable care by allowing NCCS Hightower access to his alleged victim, mid-interview, while he was armed, increased the risk, foreseeability, and likelihood of harm to Takara. First, the Navy knew NCCS Hightower was circling the house in his vehicle, expressing concern to Naval command. And yet, the Navy, through its agents, officers, and employees, negligently permitted him to enter the dwelling armed with the handgun they undertook to confiscate days prior. The failure to use reasonable care in keeping NCCS Hightower from entering the dwelling where his wife was being interviewed as a domestic violence victim increased the risk, foreseeability, and likelihood of injury to Takara. It was foreseeable that NCCS Hightower, an individual the Navy knew had a history of mental

health issues and domestic violence, was at a high risk of committing further acts of violence against his wife, including the use of the firearm the Navy already knew posed a threat to his wife. The Navy was also aware that NCCS Hightower feared what a domestic violence finding would do to his career, yet needlessly provoked him into murdering his wife by disclosing the domestic violence interview time and location.

6.17.    The United States Congress voluntarily undertook the creation of a national instant background check system upon passage of the Brady Bill. To implement this system, the Department of Justice created the National Instant Criminal Background Check System. The Department of Defense and Department of the Navy implemented policies, procedures, manuals and instructions regarding the reporting of individuals who were confined in a mental institution. These policies and procedures included the collection, maintenance, and reporting of fingerprint cards of those disqualified individuals.

6.18.    The United States, through its agencies, voluntarily undertook the training and supervision of its employees responsible for the collection, maintenance and submission of fingerprint cards and final disposition reports to the FBI.

6.19.    The United States, through its agencies, voluntarily undertook the correction of inaccurate or incomplete submissions to the FBI's National Instant Criminal Background Check System. On multiple occasions, the Department of Defense's Inspector General alerted the United States and its agencies to its negligent failure to collect, maintain, and submit fingerprint cards and final disposition data to the FBI. The Navy agreed with the Inspector General's recommendations and agreed to take corrective action.

6.20.    The United States, through its agencies, negligently failed to: (a) collect, maintain and transmit NCCS Gregory Hightower's fingerprint cards to the FBI and DOD DIBRS; (b) submit NCCS Gregory Hightower's reports to the FBI and DOD DIBRS; submit NCCS Gregory Hightower's MPO to the FBI and DOD DIBRS; train and supervise its employees and agents with regard to the collection, maintenance and transmission of fingerprint cards to the FBI and DOD DIBRS; train and supervise its employees and agents with regard to the submission of reports to the FBI and DOD DIBRS; and (e) to take corrective action multiple times when alerted to this negligence (and after agreeing to take corrective action).

6.21.    The United States, through Congress and its agencies, rendered these services because Congress and the agencies recognized that they were necessary for the protection of individuals like the Plaintiffs. To limit this violence, Congress disqualifies certain people from buying, owning or possessing guns and established a national background check system to prevent these people from obtaining guns. In fact, when asked the question, "[W]ho do you believe is the beneficiary of the Brady Act? Who do you think Congress was trying to protect?" Thomas Ward, Deputy Assistant Attorney General for the United States responded, "All of us. Three hundred and sixty-five million Americans."[28] The Brady Act was intended to protect all Americans, including Plaintiffs.

6.22.    The failure to use reasonable care increases the risk that individuals like NCCS Gregory Hightower obtain firearms and possess firearms when they are prohibited by law from doing so. In fact, the

---

[28] *Sanders v. United States*, No. 18-1931 (4th Cir. May 7, 2019) (Oral Argument).

foreseeable and proximate result of the failure to use reasonable care is that individuals like NCCS Gregory Hightower will pass the background check when obtaining firearms to use for a murder, like the one he committed of Takara Hightower. The United States, through its agencies, knew of the specific increase of risk posed by NCCS Gregory Hightower because the United States knew of his conduct from 2019 to 2022 as detailed in this Complaint.

6.23.     Plaintiffs relied on the United States to use reasonable care in its undertaking. The family trusted the Government's repeated promises to this family to confiscate NCCS Gregory Hightower's guns, to secure the family from, and execute its FAP and other domestic violence programs effectively. Had the Government never undertaken these responsibilities, the family would have sought help elsewhere (e.g., other family, religious institutions, state civil and criminal recourse, etc.). But the family's reliance on the Government executing its undertakings with reasonable care is the very reason that Takara Hightower cooperated with the Navy and, specifically, the NCIS officers interviewing her. In sum, she was in the location where the Navy told NCCS Gregory Hightower she would be because of her reliance on the Government's undertaking.

### 3.   *Negligent Failure to Train & Supervise*

6.24.     As alleged in this Complaint, the Navy's agents, officers, and employees committed an actionable tort under Texas law—negligent undertaking. The United States and its agencies have an obligation to adequately train and supervise employees. The Navy's failure to adequately

perform duties it voluntarily undertook was caused, in whole or in part, by failures in operations, organization, training, and supervision.

6.25.    The United States, through its agencies, failed to adequately supervise the individuals who voluntarily undertook the duty to reasonably perform the actions detailed in this Complaint. Had the Navy adequately supervised the manner in which Naval Command and Family Advocacy performed the duties it voluntarily undertook, they would have noticed that their employees failed to reasonably perform those duties, including removing the firearm and keeping an armed domestic abuser from accessing the firearm while gathering his belongings, or accessing the victim in the middle of an interview.

6.26.    These failures by the Navy to train and supervise its responding and investigating personnel led to its employees failing to adequately respond, investigate, and secure the premises of an ongoing domestic violence allegation. Thus, the United States is liable for negligent training and negligent supervision.

## CAUSATION

7.1.    One or more of the above negligent acts of the Department of the Navy directly and proximately caused injury to the Plaintiffs. The death of Takara Hightower was foreseeable and preventable.

7.2.    When Takara Hightower reported escalating domestic violence from her husband NCCS Gregory Hightower to the Naval Command, along with his recent acquisition of guns, and incidents where he attempted to strangle her, threatened her at gunpoint, cut off the electricity to her home,

and removed hidden weapons from the home, the Navy voluntarily undertook the duty to keep Takara and her children safe through the Navy's Family Advocacy Program and Military Protective Order. The death of Takara Hightower was a direct, proximate and foreseeable result of one or more acts of negligence by the Department of the Navy and its negligent undertaking of Takara Hightower's domestic violence complaint through its failure to confiscate his weapons, providing NCCS Hightower with unsupervised access to his weapons, its failure to provide safe and secure housing to Takara Hightower, its failure to properly implement a Military Protective Order, and its negligence in informing NCCS Hightower that Takara was speaking to NCIS Officers at their home. But for the Navy's negligent undertaking, more likely than not, Takara Hightower would be alive today.

7.3.    When NCCS Gregory Hightower attempted to purchase the firearm that he used to kill his wife, the FBI Incident-Based Reporting System should have included NCCS Gregory Hightower's commitment(s) to a mental institution. The FBI's database did not contain any of this required information, or alternatively, contained incorrect or incomplete information, as a direct and proximate result of one or more of negligent acts of the Department of the Navy as detailed in this complaint.

7.4.    When NCCS Gregory Hightower attempted to purchase the firearm that he used to kill his wife, the FBI's National Instant Criminal Background Search System should have contained Gregory Hightower's information populated from the FBI's Next Generation Identification (or the Interstate Identification Index) system. The FBI's National Instant Criminal Background Search System should have contained Gregory Hightower's information populated by submission of reports of his confinement in mental

institutions provided by the Department of the Navy. However, because of the Government's negligence, his fingerprint identification and reports were not submitted to the FBI and the FBI's Background Check system did not contain disqualifying information that would have prevented Gregory Hightower's purchase of the weapon he used to kill his wife.

7.5.    As a result of one or more of the above acts of negligence, the Government's failure to report Gregory Hightower to the FBI National Instant Criminal Background Search System for his confinement(s) in mental institutions also resulted in the failure to confiscate weapons that he was not legally permitted to possess after his confinement in mental institutions. But for the United States' negligence, there would have been prohibiting information that required the Navy to confiscate any weapons in Gregory Hightower's possession when his wife made a domestic violence report by virtue of his prior confinement in mental health institutions.

7.6.    Had the Navy reported NCCS Gregory Hightower's information about prior commitments to mental health institutions, he would have been blocked from purchasing weapons and it would have been unlawful for him to possess weapons. The purpose of the Uniform Federal Crime Reporting Act of 1988, the Brady Handgun Violence Prevention Act, and the Domestic Violence Offender Gun Ban are to ensure that violent offenders and high-risk individuals like Gregory Hightower do not get access to firearms. The Department of Defense in 1994 began designing the Defense Incident-Based Reporting System (DIBRS) to meet criminal justice related reporting requirements mandated by the Uniform Federal Crime Reporting Act and the Brady Handgun Violence Prevention Act. The entry into the federal law-

enforcement database would have blocked Gregory Hightower's purchase or possession of the weapon that he used to kill Takara Hightower.

## DAMAGES

8.1.    Takara Glenn Hightower was shot in the face with a firearm that should have been removed, as promised, by the Navy days prior. She was shot by a weapon that the Navy knew was in the home and provided her murderer access to the weapon. She was murdered in her living room, a place that the Navy should have secured or otherwise prevented NCCS Hightower from accessing in the middle of a domestic violence interview.

8.2.    As a result of the negligence of the United States employees, agents, or representatives, the Estate of Takara Glenn Hightower suffered damages for which recovery is sought, including:

> Past conscious physical pain & suffering;
> Past physical disfigurement;
> Past medical expenses;
> Past conscious mental anguish;
> Past and future lost income and earning capacity, and
> Funeral and burial expenses.

8.3.    In addition, Chinetha Hightower, as personal representative of the Estate of Takara Glenn Hightower, seeks recovery of all other damages to which she is entitled pursuant to the applicable state and federal law.

8.4.    Chinetha Hightower, mother of Takara Glenn Hightower, has suffered damages individually as a result of the negligence of the United States, employees, agents, or representatives, including:

> Past and future pecuniary loss including loss of
> earning capacity, advice, counsel, services, care,
> maintenance, support, and reasonable contributions of
> a pecuniary value;
> Past and future loss of companionship and society;
> Past and future mental anguish; and
> Past and future loss of consortium with her daughter.

8.5.     In addition, Chinetha Hightower, individually, seeks recovery of all other damages to which she is entitled pursuant to the applicable state and federal laws(s).

8.6.     As a result of the negligence of the United States employees, agents, or representatives, Chinetha Hightower, individually and as legal guardian of Takara's minor children G.H.(1), G.H.(2), G.H.(3), G.H.(4), and G.H.(5), suffered damages for which recovery is sought, including:

> Past and future medical, healthcare, and attendant
> care expenses;
> Past and future pecuniary loss including loss of
> earning capacity, advice, counsel, services, care,
> maintenance, support, and reasonable contributions of
> a pecuniary value;
> Past and future mental anguish;
> Past and future loss of companionship and society;
> Past and future loss of consortium with their mother;
> Loss of inheritance;
> Out of pocket expenses; and
> Other pecuniary damages.

8.7.     Plaintiff Danielle Ruffin, individually, has suffered damages as a result of the negligence of the United States, employees, agents, or representatives, including:

> Past and future medical, healthcare, and attendant
> care expenses;

> Past and future pecuniary loss including loss of
> earning capacity, advice, counsel, services, care,
> maintenance, support, and reasonable contributions of
> a pecuniary value;
> Past and future mental anguish;
> Past and future loss of companionship and society;
> Past and future loss of consortium with their mother;
> Loss of inheritance;
> Out of pocket expenses; and
> Other pecuniary damages.

8.8.    Scott Edward Scott, father of Takara Glenn Hightower, has suffered damages individually as a result of the negligence of the United States, employees, agents, or representatives, including:

> Past and future pecuniary loss including loss of
> earning capacity, advice, counsel, services, care,
> maintenance, support, and reasonable contributions of
> a pecuniary value;
> Past and future loss of companionship and society;
> Past and future mental anguish; and
> Past and future loss of consortium with his daughter.

8.9.    In addition, Scott Edward Scott, individually, seeks recovery of all other damages to which he is entitled pursuant to the applicable state and federal laws(s).

8.10.    Plaintiffs seek recovery of all other damages to which they are entitled pursuant to the applicable state and federal law(s).

8.11.    Plaintiffs do not seek pre-judgment interest or punitive damages. *See* 28 U.S.C. § 2674.

## RELIEF REQUESTED

9.1.    Plaintiffs request that the United States be cited in terms of law to appear and answer this lawsuit. Upon final trial, Plaintiffs seek judgment against the United States for the amount of actual damages and for such other and different amounts that they shall show by proper amendment before trial; for post-judgment interest at the applicable legal rate; for all Court costs incurred in the prosecution of this lawsuit; and for such other relief, in law or equity, both general and special, to which the Plaintiffs may show themselves entitled to and to which the Court believes them deserving.

Respectfully Submitted,

/s/ Laurie Higginbotham
LAURIE HIGGINBOTHAM
  lhigginbotham@nationaltriallaw.com
  Texas State Bar #50511759
TOM JACOB
  tjacob@nationaltriallaw.com
  Texas State Bar #24069981
WHITEHURST, HARKNESS,
  BREES, CHENG, ALSAFFAR,
  HIGGINBOTHAM, & JACOB
  P.L.L.C.
1114 Lost Creek Blvd. Suite 410
Austin, TX 78746
(512) 476-4346 (o)
(512) 467-4400 (f)

Attorneys for Plaintiffs